IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MALCOLM HERRING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:07-cv-823-MEF |
| | ) | |
| STATE FARM MUTUAL | ) | (WO – DO NOT PUBLISH) |
| AUTOMOBILE INSURANCE | ) | |
| COMPANY, d/b/a STATE FARM | ) | |
| INSURANCE COMPANIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

On July 30, 2007, Malcolm D. Herring, Jr. ("Plaintiff") filed suit against State Farm

Mutual Automobile Insurance Company ("Defendant") in the Circuit Court of Montgomery

County, Alabama.  Plaintiff alleges breach of contract and bad faith in failing to pay benefits

on an underinsured motorist claim Plaintiff filed.

This cause is before the Court on Defendant's Motion for Summary Judgment (Doc.

#28) filed on July 10, 2009.  The Court has carefully considered the arguments made in

support of and in opposition to the motion, and for the reasons set forth below, the Court

finds that the motion is due to be GRANTED.

### II. JURISDICTION AND VENUE

Jurisdiction over Plaintiff's claims is proper under 28 U.S.C. § 1332(a) (diversity).

The parties do not contest personal jurisdiction or venue, and the Court finds adequate

allegations in support of both personal jurisdiction and venue.

### III. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the

other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTS AND PROCEDURAL BACKGROUND

The Court has carefully considered all depositions, affidavits, and other documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the following facts.

### A. Facts

#### 1. The Collision

Plaintiff was involved in a motor vehicle collision on August 2, 2005 while driving his 1995 Chevrolet Suburban on Perry Hill Road in Montgomery. David Hooks' ("Hooks") Oldsmobile Cutlass collided with a Mitsubishi Endeavor Nancy Beeman ("Beeman") was driving. Beeman's Mitsubishi then collided with Plaintiff's vehicle, pushing it into the car stopped in front of him.

#### 2. Plaintiff's Medical Treatment

Two days after the collision, Plaintiff sought medical care. He went to both Primary Care Internists ("Primary Care") and Montgomery Neck & Back Pain Center ("Montgomery

N&B"), a chiropractic office.  During his visit to Primary Care, Dr. Mukkamala stated that Plaintiff had previously undergone a cervical vertebra fusion and determined that Plaintiff should not have any more surgery.  At Montgomery N&B, Plaintiff saw Dr. Hogan, a chiropractor and a personal friend.  Plaintiff complained of back pain, neck pain and stiffness, loss of balance, and pins and needles in his arms and legs.  Though Plaintiff reported in a Montgomery N&B form that he had never had these problems or similar problems before, he stated in the same form that he had seen another doctor previously for these same conditions.  Plaintiff further noted that he had undergone no surgery for these problems.  Dr. Hogan diagnosed Plaintiff with cervical disc displacement with associated cervical spondylosis without myelopathy, complicated by brachial neuritis.

In the two weeks following the collision, Plaintiff sought regular treatment at Montgomery N&B and paid another visit to Primary Care.  At the end of his series of appointments at Montgomery N&B, Dr. Hogan wrote that Plaintiff responded well to treatment, with increased range of motion and decreased pain.  Dr. Hogan anticipated more progress in the future, but added that Plaintiff may need additional care from "another discipline."

Dr. Hogan referred Plaintiff to Dr. Davis at Alabama Orthopaedic Specialists ("Alabama Orthopaedic").  Plaintiff saw Dr. Davis three times in late August 2005.  In addition to the diagnoses made by Dr. Hogan, Dr. Davis believed Plaintiff might have injured his rotator cuff.

4

From September 2005 to August 2006, Plaintiff sought medical treatment once or twice each month at some combination of Primary Care, Alabama Orthopaedic, or The Center for Pain ("Pain Center").  Plaintiff responded "very well" to an injection of Depo-Medrol in a September visit to Alabama Orthopaedic and was still doing well as a result of that injection three months later.

In a report from Plaintiff's visit to Pain Center on December 8, 2005 it was stated that he suffered from neck and shoulder pain "that has been present for several years."  It was also noted that Plaintiff had no previous spinal surgeries and was taking Coumadin, which prevented him from being able to have surgery for his back pain.  Plaintiff received his first cervical block injections and tolerated them well.  However, Plaintiff continued to complain of back and shoulder pain in doctor's visits through July 2006.

### 3. Plaintiff's Insurance Policies

At the time of the collision, Plaintiff and his wife each had in effect separate automobile insurance policies with Defendant that included underinsured motorist coverage of $20,000.  Plaintiff could "stack" those policies for a total of $40,000 in underinsured motorist coverage.  Additionally, Plaintiff had $5,000 in medical payments coverage under his policy with State Farm.

### 4. Defendant's Handling of Plaintiff's Claim

By August 6, 2005, Defendant had been notified of the collision.  On that date Suzy O'Mara, a representative for Defendant, contacted Plaintiff to interview him and confirm the

facts of the collision. Other representatives noted that some of Plaintiff's pain and numbness might result from preexisting conditions. Defendant knew soon after the accident that fault was clear and probable with Hooks. GMAC, Hooks's insurer, accepted its insured's liability for the collision. Defendant also had no reason to believe that Plaintiff drove negligently or exaggerated his injuries.

Within the next month-and-a-half, Defendant paid Plaintiff $923.29 under his collision coverage for damage to the Suburban. Plaintiff paid the remaining $50 of damages as his deductible. On September 19, 2005, Defendant received a letter from Joseph Stewart, Plaintiff's attorney at the time, indicating that an underinsured motorist claim would be filed. At that point, Alfred Williamson ("Williamson"), a claims representative for Defendant, took primary responsibility for Plaintiff's claim. Kirk Wascom ("Wascom"), a claim team manager for Defendant, would oversee Williamson's work and periodically review the claim. Wascom had the authority to overrule Williamson's evaluation.

Immediately after taking the claim, Williamson placed $6,920 in "reserves." This amount represented Williamson's contemporaneous estimate of the value of Plaintiff's underinsured motorist claim. He also contacted GMAC, Hooks's insurer, to receive reimbursement for the payments expended to repair Plaintiff's Suburban. Daniel Lyles, a GMAC representative, informed Williamson that the liability limits on Hooks's policy were low, though he could not divulge the actual amount. This information provided Defendant with further reason to expect Plaintiff to eventually file an underinsured motorist claim.

6

On October 21, 2005, Williamson wrote a "Progress Report," noting that Plaintiff's underinsured motorist claim was still pending.  Plaintiff stated that the collision aggravated a preexisting neck condition.  Plaintiff also complained of neck, shoulder, and arm pain.  Williamson reported that Plaintiff had only sent Defendant information about one doctor's appointment, with Dr. Hogan, occurring thirteen days after the collision.  He added that, based on the impact involved in the collision and the medical information currently received, he "would not expect there would be any [underinsured motorist] exposure at this time."

On December 26, 2005, Defendant received a series of medical reports from Plaintiff referring to several visits to doctors made within two weeks following the collision.  By mid-2006, Defendant knew that GMAC's liability limits were $20,000 or $25,000.  At this point, Defendant had paid Plaintiff less than $1,000 of his $5,000 in medical payments coverage.

Marcia Woodham ("Woodham"), Plaintiff's new attorney, wrote Williamson in July 2006.  Williamson responded with an acknowledgment letter requesting that Woodham send him any of Plaintiff's medical bills which Plaintiff had not yet submitted.  In October, Wascom noted that Plaintiff's underinsured motorist claim remained pending.  In November, Williamson received bills and records from Woodham and responded by paying Plaintiff $4,135 in medical payments coverage, exhausting the limits of his policy.

On December 7, 2006, Williamson learned from GMAC that Plaintiff had yet to present it with a demand for payment under Hooks's policy with that carrier.  Woodham did make that demand with a letter dated January 30, 2007.  Among other things, Woodham

7

stated that because Plaintiff took Coumadin for his blood clots, he could not have surgery for his pain.  Instead, Plaintiff had to receive cervical facet block injections every eight to ten weeks to treat it.  Woodham added that his injuries forced lifestyle changes on Plaintiff—he could not dress himself or mow his lawn.  This letter was part of Defendant's claim file.  Williamson stated that its information would not necessarily go into an evaluation of Plaintiff's claim because the information came from Plaintiff's lawyer instead of a doctor.

On February 1, 2007, Woodham advised Defendant that GMAC had offered its policy limits of $20,000 to settle with Plaintiff.  Woodham told Defendant to expect an underinsured motorist claim.  Defendant noted in its "Activity Logs" that Plaintiff's underinsured motorist claim was still pending.  Williamson reviewed Plaintiff's claim file to value Plaintiff's claim and to determine what stance Defendant should take on a settlement offer.

After reviewing the claim file and learning that Plaintiff would receive $20,000 from GMAC, Williamson valued Plaintiff's claim at between $14,000 and $20,000.  He admitted that this was only a range, and he could not say definitively that Plaintiff's claim was not worth more than $20,000.  Williamson added that any underinsured motorist payments "would be made only as a compromise to avoid litigation."  Wascom concurred with Williamson's evaluation.

Defendant made this determination based on several factors:

1) Plaintiff's medical bills totaled $10,193.82.  Wascom noted that Plaintiff had "collateral sources" of payment for at least some of these charges, such as Medicare and the $5,000 of medical payments coverage from Defendant.
2) The low speed and minimal impact of the collision.  Williamson did admit that

8

Plaintiff's injuries may have become more severe due to his Suburban colliding into another vehicle after being hit from behind.  However, Wascom could not remember a single claim over his career with Defendant where serious injuries resulted from a low-impact collision.

3) At least some of Plaintiff's neck and shoulder pain predated the collision.

4) No vehicles involved in the collision were towed from the scene.  Actually, Hooks's car was towed following the collision.  Defendant responds that the pertinent fact is that neither Plaintiff's Suburban nor either vehicle that made contact with the Suburban was towed.  This showed the Suburban only had minor damage.  It also demonstrated that Plaintiff was able to drive away from the scene.

5) Plaintiff underwent a cervical fusion procedure prior to the collision.  Though at least one medical record makes this claim, several others state that Plaintiff has undergone no spinal surgeries.  Williamson could not recall whether he noticed this contradiction in Plaintiff's medical records.

6) The number of days between the collision and the time Plaintiff sought medical treatment.  Initially, records received by Defendant indicated that Plaintiff waited thirteen days after the collision before going to a doctor.  However, prior to valuing the claim, Defendant knew Plaintiff saw Drs. Mukkamala and Hogan only two days following the collision.  Wascom stated in his deposition that two days would "[n]ot necessarily" be a factor in valuing the claim.  Williamson added that a two-day wait would not necessarily devalue Plaintiff's claim.

7) Williamson's and Wascom's collective experience in evaluating claims.

Williamson and Wascom never interviewed Plaintiff, any witnesses to the accident, or any of Plaintiff's doctors.  Wascom stated that Williamson would made a "judgment call" in determining whether to conduct interviews; Defendant did not require interviewing.  Williamson said he did not interview Plaintiff because the facts of the accident were not in dispute and because Plaintiff was represented by counsel.  Neither Williamson nor Wascom could remember conferring with Lynn LeBaron, Defendant's injury claims trainer, for aid in evaluating Plaintiff's claim.

Neither Williamson nor Wascom ever came to a specific conclusion as to the extent of Plaintiff's physical pain, whether his injuries were permanent, the existence and extent of

9

emotional damages, or whether Plaintiff became more susceptible to future injuries as a result of injuries stemming from the collision. Neither representative ever placed a specific value on any of these factors, though both agreed these factors were considerations in evaluating Plaintiff's claim. Neither representative used a formula in valuing the claim. Instead, both Williamson and Wascom said they viewed the claim in its entirety, coming to a valuation based on an aggregate consideration of factors.

Williamson and Wascom both looked to the medical information and facts of the collision in valuing the claim. This helped them determine both the extent of the claimant's injuries and what injuries were actually caused by the motor vehicle collision. Wascom added that he looked to whether the claimant is "legally entitled to collect," while Williamson stated that he also considered the value a jury would place on the claim. Williamson conceded that he considers venue when looking to a hypothetical jury's valuation.

Though medical records prior to the collision may have verified references to preexisting conditions in Plaintiff's post-collision medical records, Williamson did not attempt to collect these records. He said he did not know of any disagreement with Plaintiff's attorney over his valuation of the claim until suit was filed. Williamson said he would have sought more information on the claim if Plaintiff's attorney had questioned his valuation.

Williamson contacted Woodham on April 9, 2007 to discuss Plaintiff's claim. Per her

10

request, Defendant consented to Plaintiff's settlement with GMAC and waived its subrogation rights. Williamson asked Woodham if Defendant had all the necessary information to properly value Plaintiff's claim, and Woodham stated that it did. Williamson then informed Woodham that, based on what Defendant had received from Plaintiff, it was Defendant's position that Plaintiff would be adequately compensated by the settlement with GMAC, meaning Defendant owed no payments under Plaintiff's underinsured motorist coverage.

**B. Procedural History**

On July 30, 2007, Plaintiff filed this lawsuit against Defendant in the Circuit Court of Montgomery County (Doc. #1). Defendant promptly removed the case to this Court, invoking its diversity jurisdiction. *Id.* Plaintiff did not seek remand. Plaintiff brings claims for breach of contract and bad faith in failing to pay benefits on an underinsured motorist claim Plaintiff filed (Doc. #1). Plaintiff seeks compensatory and punitive damages, interest, and costs for injuries allegedly suffered. Contemporaneous to notice of removal, Defendant moved to dismiss Plaintiff's claims (Doc. #2). The Court denied that motion in a Memorandum Opinion and Order issued on February 9, 2008 (Doc. #10).

**V. DISCUSSION**

Alabama law requires that insurers provide underinsured motorist coverage, for the purpose of protecting the insured when a tortfeasor has insufficient liability coverage to fully compensate him. Ala. Code § 32-7-23 (1975); *see State Farm Mut. Auto. Ins. Co. v.*

11

*Baldwin*, 764 F.2d 773, 777 (11th Cir. 1985).  Plaintiff alleges that Defendant breached its contract for underinsured motorist coverage while committing both normal and abnormal bad faith failure to pay.  Defendant contends that it is entitled to summary judgment as a matter of law on all of Plaintiff's claims because Plaintiff has failed to prove that his damages were caused by the collision or the extent of the damages caused by the collision.  Therefore, he cannot prove he is legally entitled to damages and, as a matter of law, Plaintiff cannot have claims for breach of contract or bad faith failure to pay damages.

## A. Breach of Contract and Bad Faith Failure to Pay

An insurer does not breach an underinsured motorist contract or commit bad faith unless and until the insured proves that he is "legally entitled to recover." Ala. Code § 32-7-23(a)[1]; *Pontius v. State Farm Mut. Auto. Ins. Co.*, 915 So. 2d 557, 564 (Ala. 2005); *see Baldwin*, 764 F.2d at 778; *Quick v. State Farm Mut. Auto. Ins. Co.*, 429 So. 2d 1033, 1035 (Ala. 1983).  To prove legal entitlement to recover, the insured must be able to establish fault on the part of the underinsured motorist, resulting damages to which he is entitled, and the extent of those damages.  *Pontius*, 915 So. 2d at 564; *see Baldwin*, 764 F.2d at 778–79; *LeFevre v. Westberry*, 590 So. 2d 154, 162 (Ala. 1991).  In other words, in the context of underinsured motorist coverage, there is no cause of action for either breach of contract or

---

[1] The underinsured motorist provisions in both of Plaintiff's insurance policies with Defendant track this statutory language.

12

bad faith when there is a legitimate dispute as to the underinsured carrier's liability.[2]  *See Pontius*, 915 So. 2d at 564.

In *State Farm Mutual Automobile Insurance Company v. Smith*, the Alabama Court of Civil Appeals ordered the trial court to enter judgment as a matter of law in favor of the insurer on the insured's bad faith claim because of a legitimate dispute as to causation and the extent of the insured's damages.  956 So. 2d 1164, 1170 (Ala. Civ. App. 2006).  Smith did not go to the emergency room following a motor vehicle collision.  *Id.* at 1165.  Instead, he saw his family doctor four days after the collision.  *Id.*  After two months of "conservative" treatment, doctors noted an increase in range of motion, strength, and generalized function, as well as a decrease in complaints of pain.  *Id.*  Four months later, a different doctor determined that Smith's injuries required surgery.  *Id.* at 1166.  The fact that the insurer did not dispute the occurrence of the accident or that the insured suffered injuries and aggravated preexisting injuries did not mean the insured was owed underinsured motorist benefits.  *Id.* at 1167.  Because the insurer could reasonably question whether the insured's need for surgery was caused by the motor vehicle collision, the insurer was entitled to judgment as a matter of law.  *Id.* at 1170–71.

Similarly, there is a legitimate dispute as to whether the collision in this case caused all of Plaintiff's claimed injuries.  The extent of Plaintiff's preexisting conditions is unclear. It is also unclear whether Plaintiff ever underwent a spinal surgery prior to the collision.

---

[2] A breach of the insurance contract is a necessary element of both "normal" and "abnormal" bad faith.  *Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1314, 1315 (11th Cir. 2004).

However, Plaintiff's doctors did make statements in the medical records that at least some of Plaintiff's pain in his shoulders, neck, and back existed prior to the collision. Additionally, Plaintiff was able to drive away from the collision, indicating that his injuries might not be that serious. Therefore, Defendant could reasonably wonder what injuries and how much of Plaintiff's pain stemmed from the collision on August 2, 2005.

There is also a legitimate dispute as to the extent of Plaintiff's damages. Plaintiff's medical bills totaled slightly more than $10,000, and at least $5,000 of that total was already paid for by collateral sources. Several medical reports indicated that Plaintiff responded well to treatment and that his complaints of pain lessened over time. Defendant could reasonably doubt that Plaintiff's future medical bills as a result of the collision would be that costly.

Parts of the record indicate that Defendant may not have been above reproach in evaluating Plaintiff's claim. Plaintiff sought medical treatment early and often following the collision, indicating that new injuries resulted from that collision. Plaintiff will likely have to receive periodic facet block injections for the rest of his life to deal with his pain, a continuing cost. Additionally, the fact that the upper limit of Defendant's valuation of Plaintiff's claim equals what Defendant knew Plaintiff would receive from GMAC certainly raises eyebrows. However, the record demonstrates a legitimate dispute as to whether the value of Plaintiff's claim is high enough to make Plaintiff "legally entitled to damages." Though Hooks' fault in the collision is clear and probable, Plaintiff has no cause of action for breach of contract or bad faith failure to pay until the extent of his damages caused by

14

that collision are fixed. *Pontius*, 915 So. 2d at 564; *see Baldwin*, 764 F.2d at 778–79; *LeFevre*, 590 So. 2d at 162. Therefore, as a matter of law, Plaintiff's claims of breach of contract and bad faith cannot be raised at this point.[3]

## B. Abnormal Bad Faith

Abnormal bad faith represents the second type of bad faith under Alabama law. *Mut. Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1314 (11th Cir. 2004). In order to recover for abnormal bad faith, the insured must show that (1) the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review; and (2) the insurer breached the insurance contract when it refused to pay the insured's claim. *Id.* at 1315.

In *Henderson*, the Eleventh Circuit reversed summary judgment in favor of the insurer on the insured's abnormal bad faith claim. *Henderson*, 368 F.3d at 1319–20. The Court stated that if there was an issue of material fact about whether the insurer properly investigated the insured's claim before the denial of coverage, a summary judgment ruling on the abnormal bad faith claim would be erroneous. *Id.* This is because, unlike in normal

---

[3] The Alabama Supreme Court has given general rules for situations where an insured and his underinsured carrier come into conflict. *Lambert v. State Farm Mut. Auto. Ins. Co.*, 576 So. 2d 160, 167 (Ala. 1991). Plaintiff and Defendant in this case have correctly followed these procedures in Plaintiff's settlement with GMAC. *See id.* Once Defendant waived its subrogation rights and Plaintiff released Hooks and GMAC from liability for the motor vehicle collision, the only party that could be found liable is Defendant. Regrettably, Plaintiff has chosen not to sue Defendant directly for any damages resulting from the motor vehicle collision. Plaintiff instead has asserted only claims for breach of contract and bad faith. As a matter of law, Plaintiff cannot assert these claims because Plaintiff's damages are not fixed.

bad faith claims, "providing an arguable reason for denying an 'abnormal' bad faith claim does not defeat that claim." *Id.* at 1315.

The *Henderson* Court found issues of material fact about the adequacy of the insurer's investigation, including, among other things, a failure to "marshal all of the pertinent facts with regards to its insured's claim" prior to denial of coverage. *Id.* (quoting *Nat'l Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 130 (Ala. 2002)). In *Henderson*, the insurer's representative failed to contact the insured to inquire about their claims. *Id.* at 1318. Similarly, Williamson never interviewed Plaintiff on his underinsured motorist claim.[4] Williamson also failed to gather medical records from prior to the collision, which might indicate what injuries and pain were caused by the collision. *See id.* Therefore, an issue of material fact might exist as to the first element of abnormal bad faith.[5]

However, even if Plaintiff could survive summary judgment on the first element of abnormal bad faith, the claim also requires a breach of the insurance contract. *Id.* at 1315; *Federated Mut. Ins. Co., Inc. v. Vaughn*, 961 So. 2d 816, 820 (Ala. 2007) ("To recover for

---

[4] Though Suzy O'Mara did interview Plaintiff just after Defendant learned of the collision, Williamson did not, and Williamson had primary responsibility for the claim.

[5] This is far from definite. The *Henderson* Court found that there was no issue of material fact as to a failure to properly investigate when the insured's representative reviewed all information in the claim file prior to denying the claim. *Henderson*, 368 F.3d at 1318. Importantly, the insured had no duty to interview the claimant when the claimant's version of the facts was contained in the claim file. *Id.* Williamson would know Plaintiff's version of the facts by reviewing O'Mara's summary of her interview with Plaintiff and through correspondence from Plaintiff's attorney. *See also Smith*, 956 So. 2d at 1168–69 (holding that the insurer was entitled to judgment as a matter of law on an abnormal faith claim because the evidence showed the insurer evaluated the insured's claims by considering his medical records).

16

bad-faith failure to investigate an insurance claim, the insured must show that the insurer breached the insurance contract when it refused to pay the insured's claim."). In *Henderson*, this element of the abnormal bad faith claim was not disputed. 368 F.3d at 1315. In this case, however, Defendant has demonstrated as a matter of law that it did not breach its contract. Thus, Defendant has also established that it is entitled to summary judgment on Plaintiff's abnormal bad faith claim because it has shown that Plaintiff cannot offer evidence in support of an element of a prima facie case for abnormal bad faith.

## VI. CONCLUSION

For the reasons set forth in this Memorandum Opinion and Order, Defendant's Motion for Summary Judgment (Doc. # 28) is GRANTED. The Court will enter a separate final judgment in favor of Defendants consistent with this Memorandum Opinion and Order.

DONE this the 15th day of October, 2009.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE